# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JORGE VILLANUEVA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL CASE NO. 02-4122 |
| | § | |
| RICK THALER, Director, Texas Department | § | |
| of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Jorge Villanueva, a Texas death row inmate, filed a federal petition for a writ of habeas corpus in 2002, challenging his state-court capital conviction and death sentence. This court stayed the case to allow additional state-court action. The case was reopened in 2011 and Villanueva filed an amended federal habeas corpus petition. (Docket Entry No. 34). Villanueva's amended petition alleges that his trial counsel's representation fell short of constitutional requirements. The respondent, Rick Thaler, Director of the Texas Department of Criminal Justice (TDCJ), has moved for summary judgment. (Docket Entry No. 41). Based on the pleadings, the state court record, and the relevant law, this court grants the respondent's summary judgment motion, denies Villanueva's habeas petition, and declines to issue a certificate of appealability. Final judgment is issued by separate order. The reasons for these rulings are set out below.

# I.    Background

## A.    The Trial Record[1]

The trial record shows that on the morning of August 28, 1994, Jorge Villanueva, then 27 years old, was drinking beer with friends. He talked to his friends about his septuagenarian neighbor, Ms. Jova Montiel. Villanueva told his friends that he had looked inside Ms. Montiel's window that morning and had seen "her body on the floor with blood all over[.]" (Tr. Vol. 16 at 387.) Villanueva said that he went back a second time and saw "her on the bed with her hands crossed over her crotch," and that she "had some nice boobies[.]" (Tr. Vol. 16 at 389.) This remark did not surprise his friends; Villanueva had previously said, "sexual wise," that "she was a nice lady for being that age," "he'd sure like to get her," and "he would like to get some of that" from her. (Tr. Vol. 16 at 393-94.) After repeatedly rebuffing his friends' urging for him to call for assistance, Villanueva abruptly said that he had to leave. His friends observed fresh scratches across Villanueva's nose and body.

Later that day, another friend encountered Villanueva as he was getting off a bus. Villanueva gave his friend a radio, later shown to have come from Ms. Montiel's home. Villanueva told his friend that he thought Ms. Montiel might be dead. Villanueva twice said that:

> he had gone over to her house knocked on the door [which] was ajar
> and he had looked inside and she was laying on the bed . . . . and
> wasn't moving . . . . [H]e went back later and looked through the

---

[1]     The state-court record consists of a Clerk's Record that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Clerk's Record at ___"; a supplement to the Clerk's record cited as "Supp. Clerk's Record at ___"; a Statement of Facts, including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "Tr. Vol. ___ at ___"; a transcript of the state habeas proceedings, cited as "State Habeas Record at ___"; and a supplemental habeas transcript, cited as "Supp. Habeas Record at ___."

> window. This time she was on top of the floor . . . . He thought she
> was probably dead.

(Tr. Vol. 16 at 352-53.) When Villanueva told the story a third time, his friend asked why he had

not called for help. Villanueva said that "it might get him into trouble." (Tr. Vol. 16 at 353.) After

his friend asked "how would he feel if the old lady was his mama laying on the floor and needed

some help," they went to a nearby store and his friend anonymously called 911. (Tr. Vol. 16 at 353.)

Paramedics arrived at Ms. Montiel's home and found her door unlocked. Ms. Montiel was

lying naked on her blood-splattered bed. She had been sexually assaulted, beaten, and strangled.

The number and severity of her wounds, as well as the large amount of blood throughout the

bedroom, indicated that she had been violently assaulted before she died of asphyxia.

When the police arrived on the scene, a neighbor, Lazaro Aguilar, told them to investigate

Villanueva because he had been harassing Ms. Montiel. Two police officers crossed the street to talk

to Villanueva, who identified himself as George Rios. Villanueva told the police officers that he

knew Ms. Montiel but did not know anything about her. When asked about the scratches on his face,

Villanueva claimed that his wife had scratched him during a fight the night before. Villanueva's

wife denied fighting with her husband. The police took Villanueva to the homicide office.

Villanueva voluntarily gave the police blood, hair, and saliva samples and a written

statement. In his statement, Villanueva said that though he had seen a strange man leaving the

victim's house on the night of the murder, he did not know anything was wrong until the police

arrived. He explained that his scratches came from "cutting weeds" while doing community service

and from "a brawl [he] had with [his] wife" the night before. (Tr. Vol. 23, Statement of "George

Rios" given August 28, 1994.)

3

The evidence resulting from the police forensic investigation include three extraneous pubic hairs recovered from the crime scene. The police wanted to keep Villanueva in custody until they tested the pubic hairs. After three days in jail, the police released Villanueva because the crime lab had not yet completed the testing. Nearly two months later, the results of the crime lab's testing connected Villanueva to the crime. The police arrested him.

After waiving his rights, Villanueva confessed to the murder, stating as follows:

> On Saturday, August 28 1994 I went to the old lady's house on Kane Street. I know the old lady by the name "Jovita." . . . I went to the old lad[y's] house around 8:00 pm that evening. I went to her house to pretend to fix her kitchen door. I knocked on the old lad[y's] front door. The old lady came to the front door and opened the front door. I could see that the old lady was just dressed in a bath towel. The towel was about the top of her breast down to below her knees. When I saw her in the bath towel it appeared to me that she was getting ready to take a bath. I asked her if I could come inside to fix her kitchen door. The old lady opened the front door and allowed me to come inside. Once I was inside it was just a split second that I decided that I wanted to have sex with the old lady. I grabbed the old lady and I asked the old lady in Spanish if she wanted to have sex. She does not speak any English. I grabbed her by both arms. When I did this the bath towel fell down to the floor. The old lady was totally nude. She had nothing on underneath. When I asked the old lady to have sex she told me no. At this time I got mad and I grabbed her and I threw her causing her to hit the front part of her head on the sharp corner of the door. This was the door leading into the bedroom. The old lady got up from the floor and I could see that she had a cut on her forehead and she was bleeding. When the old lady got up from the floor I picked up a Mexican coke bottle that was near the bed on the floor. I then hit the old lady over the top of the head with the Mexican coke bottle at which time she fell to the floor and she was unconscious. When I hit her with the coke bottle she fell back into the first room which is the entry to the house. She was lying on her back. I then picked her up and I carried her to the bedroom and placed her on the bed. She was still knocked out.

(Tr. Vol. 23, State's Exhibit 90.)

In the statement, Villanueva described how he had raped Ms. Montiel but had not ejaculated because he "was drunk and . . . messed up on heroin." He killed Ms. Montiel when she regained consciousness. "She tried to scream. I then placed my left hand on her throat and I squeezed her throat to keep her from screaming and I must have squeezed her to[o] hard because she just died right there." (Tr. Vol. 23, State's Exhibit 90.) Villanueva left her bloody and dead on her bed. He stole a "portable radio" from the kitchen table as he left the house. The next morning, he met a friend, Jimmy Santiago Gonzalez, and gave him the radio.

The State of Texas charged Villanueva with capital murder committed in the course of, or in the attempted commission of, aggravated sexual assault or burglary.

**B.    Pretrial Representation**

Villanueva's amended motion alleges that his trial attorney, Phillip M. Campa, was inept and unprepared to defend him. Villanueva describes Campa as "woefully unqualified" to defend a capital case. (Docket Entry No. 34 at 9). The record shows that four attorneys had been appointed to defend Villanueva before he chose to retain Campa only 17 days before the scheduled trial date.

On October 26, 1994, the trial court appointed Allen C. Isbell to represent Villanueva. (Supp. Clerk's Record at 6.) On May 18, 1995, the trial court appointed Jorge Villarreal to sit second chair. (Supp. Clerk's Record at 13.) Beginning in October 1995, attorneys Isbell and Villarreal began filing pretrial motions on Villanueva's behalf. The motions included are for investigative assistance and one for DNA testing of the hair and blood samples found at the crime scene. (Supp. Clerk's Record at 102-04, 105-07.[2]) The trial court granted both motions on October 26, 1995.

---

[2]     The trial court limited the investigative funds to $1,500. (Supp. Clerk's Record at 104.)

Attorneys Isbell and Villarreal prepared for a trial scheduled for April 1996. In a hearing three weeks before the trial date, they asked for permission to withdraw. Isbell explained that "[t]he representation has deteriorated" because of "some things Mr. Villanueva has stated which are untrue and which I have found offensive personally." (Tr. Vol. 3 at 3.) Isbell stated that Villanueva had lodged false complaints against him and Villarreal with the State Bar.[3] The trial court allowed them to withdraw and appointed Jerry Guerinot and Anthony Osso to represent Villanueva. (Supp. Clerk's Record at 108-110.) The trial court continued the trial date until September 9, 1996, for fear of "put[ting] on two new attorneys in a capital case where the death penalty case is sought by the State and not giv[ing] them adequate time." (Tr. Vol. 3 at 9.)

Attorneys Guerinot and Osso filed numerous motions on Villanueva's behalf, including a motion for expert psychological assistance relating to mitigation evidence, (Supp. Clerk's Record at 111-113); a motion to adopt all the motions filed by prior counsel, (Supp. Clerk's Record at 115-16); a new motion "for discovery and inspection of DNA evidence and for funds for DNA expert to conduct independent testing," (Supp. Clerk's Record at 118-120); and a motion for funds to employ

---

[3]    One of the attorneys explained:

> Mr. Villanueva wrote the State Bar Grievance Committee complaining that I had not been to see him except one time. The fact is as he knows and as the letter confirms I have been to the jail to see him over six times for long periods of times. He claimed that I was a corporate lawyer and he claimed that I was dishonest. He claimed that I had told him that he was a dead man which I never have done. He said that I told him that he ought to confess and plead guilty and throw himself on the mercy of the jury which is totally contrary to anything that I have advised. I have never suggested that as a viable theory nor do I think it would be one. That is the essence of the statement against me.

(Tr. Vol. 3 at 4-5.)

a criminologist to show that Villanueva was not a future societal danger, (Supp. Clerk's Record at 123-25.). Guerinot described their efforts to prepare for trial:

> . . . Mr. Osso and I have done extensive preparation for this case. We have lined up expert witnesses for the guilt and innocent stage and should there have been an adverse finding also for the punishment stage. We have lined up criminologists, psychiatrists, DNA experts, the whole gamut. We have spent hundreds of hours in preparation for this case and we'd like the record to reflect this.

(Tr. Vol. 3 at 15.)

On August 22, 1996, fewer than three weeks before the scheduled start of trial, attorney Phillip M. Campa filed a motion to substitute in as Villanueva's trial attorney. (Supp. Clerk's Record at 134-35.) Affidavits from Campa and from Villanueva's family differ on several points about how Campa came to represent Villanueva. Campa and the family agree, however, that with a trial date fast approaching, Villanueva's wife came up with money to hire Campa. At Villanueva's request, Campa moved to represent him at trial.

According to Campa, Villanueva knew that the imminent trial date could compromise defense preparations. Campa explained: "I believe that it was important that [Villanueva] understand . . . that his previous counsel had been on the case longer than I had, and would be expected to be better prepared. I explained that to Mr. Villanueva, and he still wanted to go forward with the substitution." (Docket Entry No. 34, Appendix #7, Affidavit of Philip M. Campa dated Sept. 18, 2000) ("Trial Counsel Affidavit at ___").[4]

---

[4] The state habeas court ordered Campa to provide an affidavit in response to Villanueva's allegations of ineffective assistance. (State Habeas Record at 200-01.) The state habeas court explicitly and repeatedly found the affidavit credible. (State Habeas Record at 222, 224-26, 228, 231, 235, 238, 242, 244, 246.) Although Campa's affidavit does not appear in the state court record, it was obviously before the state habeas court, which repeatedly referred to it in the findings and conclusions. Villanueva has included the affidavit
(continued...)

In a hearing on the motion to substitute, the trial court, obviously concerned with the fact that the trial date was so close, questioned Villanueva extensively about the change in counsel:

| | |
|---|---|
| Trial Court: | Mr. Villanueva, you're currently set for jury selection and trial in a capital murder case where the State is seeking the death penalty. The trial is to begin on September 9th of this year. That's approximately two or three weeks from today. Do you understand that sir? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | You have your attorney here whose name is Phillip Campa along with your appointed counsel who are also present Mr. Jerry Guerinot and Mr. Anthony Osso. Apparently Mr. Campa has filed a motion that I have signed requesting that he be allowed to substitute in on this case. Is that your wish Mr. Villanueva? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | I'm sure your attorney has discussed this with you but I want to make sure this is on the record and that you made your decision with your eyes open. I'm sure your lawyer is a competent lawyer. The computer reflects that he's tried approximately five felony cases. Have you tried any death penalty cases, Mr. Campa? |
| Mr. Campa: | I have not. |
| Trial Court: | Are you aware of that Mr. Villanueva? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | Are you aware that in a death penalty case there are specific procedures and motions and requests and other things that have to be done that are very distinct |

---

[4](...continued)
as an appendix to his amended federal petition.

|  |  |
|---|---|
|  | and unusual in a capital case as opposed to other cases? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | Do you understand that the State is seeking the death penalty? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | If you're convicted of capital murder there's a second part to the trial. Do you understand that? |
| Villanueva: | Yes. |
| Trial Court: | What is the second part of the trial if you're convicted of a capital murder? |
| Villanueva: | Well there are only two things. I get life or the death penalty. |
| Trial Court: | That's correct. At that point if you are convicted of capital murder there are certain issues that the jury will answer, certain questions that the jury will answer. If your lawyer seeks to designate experts you're entitled to that. Do you understand that? |
| Villanueva: | Yes, ma'am. |
| Trial Court: | Now that you have retained counsel as opposed to having appointed counsel there are different issues that are going to arise including the payment of those experts. Do you understand that? You have to line up those experts and make them available for trial if that's what your counsel wants. |
| Villanueva: | But I don't have no money to pay them. |
| Trial Court: | You need to talk to your lawyer. In the meantime I am not going to grant any continuances in this trial. It is your desire that you substitute in your lawyer at this stage and the case is set for jury selection to begin on September 9th. Your lawyer has told me that he is |

|              | ready and I'm not going to grant you any continuances for obtaining witnesses at this late date including experts. Do you understand this? |
|--------------|-----------------------------------------------------------------------------------------------------------------------------------------------|
| Villanueva:  | I'd like to talk to my lawyer. |
| Trial Court: | That's what you've been doing all morning. I assume that was your decision. Do you still want to talk to him again? |
| Villanueva:  | Yes, ma'am. |
| Trial Court: | Then I'll reset this hearing. |

(Tr. Vol. 3 at 10-14.) After a recess, Villanueva reiterated his choice to have Campa represent him, even with the trial date so close. The trial court allowed the substitution of counsel. (Supp. Clerk's Record at 137.)

In asking for the substitution of counsel, Villanueva knowingly gave up much of his prior attorneys' trial preparation. The trial court told Campa, in front of Villanueva, "Whatever [Guerinot and Osso] wish to share with you they may. The rest of it is your responsibility. I want to make it perfectly clear that it is no one else's responsibility or obligation to do anything but yours. I have granted the defendant's request and you will proceed to represent Mr. Villanueva." (Tr. Vol. 3 at 18-19.)

With Villanueva present, the appointed attorneys who Campa was replacing explained to the court that the experts they had retained would no longer be on the case:

> The experts that have been lined up and were willing to cooperate and proceed with us are in the file. As far as DNA experts go I have contacted the HPD Crime Lab and they told me what their procedure was and I was going to follow that procedure. They told me they could have the results back to me by the time we go to trial about what their findings were. As far as independent testing that could be done in a week or two weeks. We were well within our time frame

> for having all of the evidence presented at the trial. These people that I've talked to charge by the hour for consultation. At this time I'm going to call them and tell them what transpired and that were no longer on the case and will not be needing their services and would they please figure out how much time they have spent with us and send us a final bill.

(Tr. Vol. 3 at 19.)  Departing counsel explained: "We will tell them that Mr. Campa has been retained to represent Mr. Villanueva but that any further work that is to be done on Mr. Villanueva's behalf is at his expense and not ours and not to send us a bill for that."  (Tr. Vol. 3 at 20.)

## C.    The Trial

Campos assumed a formidable task in representing Villanueva.  Forensic evidence tied Villanueva to the crime.  He had made incriminating statements to his friends about seeing the victim bloody and apparently dead.  He had given the police a detailed confession that was graphic, crude, and ugly.  This evidence made conviction nearly certain.

Although the trial court refused to grant a continuance when Villanueva chose to replace his appointed counsel with retained counsel, on August 23, 1996, the State of Texas reindicted Villanueva under a new case number that pushed the start of trial back until October 1, 1996.  The trial court held the suppression hearing on the previously scheduled date of September 9, 1996. Campa knew when he was retained that he "needed to focus on the pretrial motion to suppress the confession."  Campa prepared by reviewing the police file, consulting with Villanueva, and interviewing his wife.  Campa focused on the suppression hearing as an opportunity "to get a lot of discovery on what [evidence] the State had and as to their theory of the case."  He "elected, after consulting with [his] client, that [Villanueva] should not testify" in the suppression hearing.  (Trial Counsel Affidavit at 3.)  Campa did not interview the police officers who interrogated Villanueva.

At the beginning of the suppression hearing, Campa orally moved to adopt all the motions filed by Villanueva's prior attorneys. (Tr. Vol. 4 at 4.) He also filed a written motion to reurge all the prior motions. (Clerk's Record at 6-7.) The trial court granted Villanueva's motions, orally and in writing. (Tr. Vol. 4 at 4; Clerk's Record at 8.)

The suppression hearing lasted two days. The State called police officers to describe Villanueva's initial statement, his release from custody, his arrest, and his confession. The defense called Villanueva's wife as a witnesses. Campa's cross-examination and questioning displayed a familiarity with the facts. He tried to show that the police had coerced Villanueva to confess. The trial court denied the motion to suppress Villanueva's two written statements but granted it as to oral statements made after the police took his blood and hair samples. (Tr. Vol. 5 at 393-95.) Campa continued his attack on the confession into trial.

Villanueva alleges that Campa's investigation was "woefully deficient." (Docket Entry No. 34 at 27). Based largely on Campa's failure to use the expert and investigative assistance that prior appointed counsel had arranged, Villanueva argues that Campa was unprepared to defend him in a constitutionally adequate manner.

Campa's state habeas affidavit outlines the investigative efforts he made to get ready for trial. The state habeas court found:

> According to the credible assertions in the affidavit of defense counsel Philip Campa defense counsel undertook the following in preparation for the instant trial; consulted with the applicant, [Villanueva's] wife, and family members; interviewed family members visited the crime scene to look at [Villanueva's] residence, the complainant's residence, and the surrounding area; met with and discussed the facts of the instant case with the prosecutor; reviewed all of the material in the State's file; several times secured copies of the autopsy report and confession; interviewed others who were

present when [Villanueva] was arrested discussed the instant case with previous defense counsel Osso; reviewed Osso's file in the instant case; consulted with a medical doctor regarding the autopsy and photos of the complainant to gain insight into the cause of death, trauma to the body, and other medical issues; consulted with the complainant's doctor, subpoenaed the complainant's medical records for review; interviewed Santiago Gonzales in the Harris County Jail; investigated other possible suspects such as Mr. Bates whose wallet was found in the complainant's house; and interviewed Greg Fazzio the landlord of the complainant and the Aguilars.

(State Habeas Record at 225.) Campa also "reviewed the police offense report which detailed the police investigation of the instant case" and "investigated facts pertinent to [Villanueva's] suppression motion and discussed the suppression issues with the applicant." (State Habeas Record at 226.)

The state court's findings are clear that this was not a case in which the defense "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009). Campa talked to Villanueva's earlier attorneys about their pretrial preparations and obtained material from them. Campa researched DNA issues and consulted a medical doctor about the victim's death. Campa investigated the relationship between Villanueva's family and the victim, trying to show that they had been helpful to her in the past. Campa explored the possibility of blaming the murder on other suspects, including the victim's neighbor and a man whose wallet was found in her house. Campa talked to the victim's landlord about problems she had with her neighbors and regularly met with Villanueva's wife to prepare her to testify at trial.

Campa did not retain substantial expert or investigative assistance. Apparently, Campa thought that Villanueva, not the court, would have to pay for such assistance. (Trial Counsel Affidavit at 6 ("I did not hire any experts because the accused informed me that his family could not

afford any.").) Campa "did not have the benefit of a private investigator because [his] client did not have the funds available." (Trial Counsel Affidavit at 6.) At a September 30, 1996, hearing, the prosecution informed the trial court that, because trial counsel did not want to do independent testing of the DNA material, "the State intends to use the remaining sample to conduct additional DNA testing that will be completed to my understanding within a week to two weeks." (Tr. Vol. 3 at 23.)

The State presented a strong case against Villanueva. The State relied heavily on Villanueva's confession while also asking the jury to "put all [the] little pieces together." (Tr. Vol. 21 at 1300.) The State argued that the scratches on Villanueva's body, the victim's fear of him, his possession of the victim's radio after the murder, the pubic hair "match[ing]" his DNA at the scene, his inculpatory comments to his friends, and the inconsistent statements he gave the police, all made it "perfectly clear" that he was the murderer. (Tr. Vol. 21 at 1300.)

Trial counsel's primary defense was attacking the voluntariness of Villanueva's confession. Campa argued that the police had used coercive tactics, ignored Villanueva's repeated pleas for an attorney, crafted the confession themselves, and then pressured him into signing it. As a secondary defensive theory, Campa also tried to cast suspicion on Ms. Montiel's neighbor, Lazaro Aguilar, with whom she had a bad relationship but when the police never seriously investigated as a suspect. The defense called witnesses, including Villanueva himself, to bolster those theories.

The jury found Villanueva of capital murder. The jury was then asked to answer two special issue questions:

## Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Jorge Villanueva, would commit

criminal acts of violence that would constitute a continuing threat to
society?

Special Issue No. 2

Do you find from the evidence, taking into consideration all of the
evidence, including the circumstances of the offense, the defendant's
character and background, and the personal moral culpability of the
defendant, Jorge Villanueva, that there is a sufficient mitigating
circumstance or circumstances to warrant that a sentence of life
imprisonment rather than a death sentence be imposed?

(Clerk's Record at 35-36.)

The State's penalty-phase case emphasized the brutality of the rape and murder. The State

argued that these acts were consistent with Villanueva's history of lawlessness. The State presented

witnesses who testified that Villanueva had previously committed such crimes as driving while

intoxicated, auto theft, and burglary of a vehicle. Villanueva had previously assaulted his wife and

young daughter and at the time of the murder, was on probation for injury to a child. The State

presented evidence of other violent unadjudicated offenses. Because Villanueva's confession alleged

that substance abuse had played a part in his rape and murder of Ms. Montiel, the State asserted that

his possession of contraband alcohol before trial showed that he would act out violently, even in

prison.

The defense did not call any punishment-phase witnesses. After resting, Campa asked

Villanueva several questions on the record but out of the jury's presence. Villanueva affirmed that

he had instructed his attorney not to call family members or any other witnesses to testify in the

punishment phase. (Tr. Vol. 22 at 60-61.) Villanueva told the trial court that he was satisfied with

his trial counsel's representation. (Tr. Vol. 22 at 61.)

Campa's closing argument emphasized the minimal evidence showing future dangerousness. Villanueva "had two DWI's, an attempted burglary of a car, and he had two assaults stemming from the same incident . . . . Given [his] age, that record, if you want to call it a record, is not as extensive as I have seen before." (Tr. Vol. 22 at 65.) Campa emphasized that Villanueva had only one infraction in the two years of incarceration before trial. Campa asked the jury to view Villanueva as a family man who had killed because of his heroin and alcohol use.

The jury's answers to the special issue questions resulted in a death sentence.

### D.    Posttrial Litigation

Villanueva unsuccessfully sought appellate review of his conviction and sentence. *Villanueva v. State*, No. 72,612 (Tex. Crim. App. Sept. 23, 1998) (unpublished). Villanueva then filed a state habeas application which, like the instant federal action, focused on alleged deficiencies in trial counsel's representation. In response to a court order, Campa provided a detailed affidavit responding to Villanueva's allegations of ineffective assistance. Campa described how he came to represent Villanueva, the trial preparations, the interactions with Villanueva and his family, and how Villanueva instructed him not to call any punishment-phase witnesses. Finding trial counsel's affidavit credible, the state habeas court entered detailed findings of fact and conclusions of law recommending the denial of relief. (State Habeas Record at 220-57.) The Texas Court of Criminal Appeals adopted the lower court's findings and conclusions. Based on that recommendation and its own review, the Court of Criminal Appeals denied habeas relief. *Ex parte Villanueva*, No. 49,591-01 (Tex. Crim. App. Oct. 31, 2001) (unpublished).

This court appointed counsel to represent Villanueva in the federal habeas process. Villanueva filed a federal petition raising six grounds for relief, all challenging trial counsel's

representation. Villanueva alleges that Campa provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 648 (1984), by:

> (1)    failing to secure a ruling on motions filed by the previous attorneys;
>
> (2)    not interviewing witnesses with information relevant to the taking of his confession;
>
> (3)    failing to challenge the State's forensic evidence;
>
> (4)    ineptly conducting jury selection;
>
> (5)    committing numerous evidentiary errors during trial; and
>
> (6)    not presenting any evidence in the punishment phase of trial.

The respondent filed an answer and moved for summary judgment. (Docket Entry No. 10). This court stayed the case to allow Villanueva to seek retesting of DNA material in state court. (Docket Entry No. 15). Because only small amounts of material remained, DNA testing in 2005 produced no results. Villanueva did not move to reopen the federal case in the hope that scientific advances would allow additional DNA testing to take place sometime in the future.

The respondent moved to reopen the case in 2010. (Docket Entry No. 17). At a hearing, Villanueva acknowledged that he could not show that DNA science had progressed to the point that would allow retesting of the material. This court then reopened the case. (Docket Entry No. 25). Villanueva filed an amended petition, (Docket Entry No. 34), and the respondent again moved for summary judgment, (Docket Entry No. 41). Villanueva filed a reply, (Docket Entry No. 44). This matter is ready for resolution.

## II.    AEDPA and the *Strickland* Standard

The writ of habeas corpus provides an important, but limited, examination of an inmate's state-court conviction and sentence. *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions."). AEDPA's "highly deferential standard for evaluating state-court rulings" codifies the principles of finality, comity, and federalism that underlie the limited scope of federal habeas review. *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) (quotations omitted). AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, ___ U.S. at ___, 131 S. Ct. at 784.

The Texas Court of Criminal Appeals decided Villanueva's *Strickland* claim on habeas review. This court can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The focus "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). AEDPA serves as a "guard against extreme malfunctions in the state criminal justice systems," not as a vehicle for error correction. *Richter*, ___ U.S. at ___, 131 S. Ct. at 786 (citation omitted); *see also Wilson v. Cain*, 641 F.3d 96, 100 (5th Cir. 2011). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, ___ U.S. at ___, 131 S. Ct. at 786.

Under *Strickland*, "[t]o establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "Surmounting *Strickland*'s high bar is never an easy task[.]" *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010). When state courts have adjudicated the merits of a *Strickland* claim, those courts "must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785. AEDPA gives state-court review of a *Strickland* claim a "doubly deferential judicial review." *Knowles*, 556 U.S. at 123; *see also Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1410 (2011). Apart from cases involving the complete or constructive denial of counsel, which is not at issue here, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984).

## III. Analysis

Campa began representing Villanueva only 17 days before the scheduled start of trial. Villanueva contends that even recognizing the short time to prepare, Campa's representation was ineffective because he did not engage in the probing investigation expected in a death case. In support of his specific habeas claims, Villanueva makes many accusations against his trial attorney. The accusations do not present grounds for the relief Villanueva seeks.

The record shows that Villanueva's own voluntary, informed, and knowing choices impeded his defense. Shortly before the scheduled trial date, Villanueva fired two experienced approved criminal defense attorneys who had made significant efforts to prepare. Villanueva knew that the

change meant that he would lose the preparation done by prior counsel and that the experts they had retained were no longer on the case. Villanueva knew that the trial court would not continue the trial date because of the change in counsel, although the trial was slightly delayed. Villanueva's choice to retain counsel so close to the trial date gave little time to prepare. Villanueva also knew that his chosen retained trial counsel had never represented a capital defendant and had little felony trial experience.

Villanueva instructed Campa not to call witnesses or put on evidence in the punishment phase. Villanueva, the "master of his own defense," prevented the presentation of any mitigating evidence. *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999). In short, Villanueva limited both the time and the ability of his chosen counsel to prepare an effective defense.

Even within those limits, trial counsel provided effective assistance. The guilt/innocence phase was critical, given Villanueva's instruction not to put on punishment-phase evidence. Given the strong evidence against Villanueva, trial counsel crafted a two-part defense: challenge the confession and blame others.

Villanueva repeatedly faults Campa for not using court-funded resources to support this defensive strategy. Campa apparently thought that Villanueva could only use DNA experts, investigators, and criminologists that he paid for himself. Financial resources drove some of the defense's tactical decisions. Villanueva faults Campa for misunderstanding his ability to use court funds for expert witnesses. But Villanueva assumes that the trial court's prior authorization of funds for experts remained effective even after private counsel was retained. The record is not clear that he was still entitled to court funds for experts. The trial court's comments that issues would "arise including the payment of experts," (Tr. Vol. 3 at 13), suggest that the court believed that

Villanueva's decision and ability to retain counsel negated his right to court-appointed experts. The parties have not provided extensive briefing or legal precedent addressing how the Texas courts have handled similar situations.

The question of whether the trial court would have provided funds does not determine Villanueva's habeas petition. Failing to use an investigator or expert witness is not *per se* deficient representation. A court looks to such factors as what counsel did to prepare for trial, what evidence was accumulated, what leads were accumulated, and what results could reasonably be expected from the leads. *See Ladd v. Cockrell*, 311 F.3d 349, 357 (5th Cir. 2002); *Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002).

Against this background, this court analyzes each of the six specific ways Villanueva claims that trial counsel was ineffective: not securing a ruling on motions filed by his previous attorneys; not interviewing guilt/innocence phase witnesses; not challenging forensic evidence; ineptly conducting jury selection; making evidentiary errors; and not presenting mitigating evidence.

## A.    Failing to Reurge Prior Motions (Claim One)

Villanueva faults Campa for not reurging and litigating the motions his previous attorneys had filed. Attorneys Isbell and Villareal filed 24 motions during their representation of Villanueva. (Clerk's Record 72-75, Supp. Clerk's Record at 18–107.) Upon appointment, attorneys Guerinot and Osso moved to adopt all motions Villanueva's prior attorneys had filed. (Supp. Clerk's Record at 115-17.) In addition to reurging the earlier requests, attorneys Guerinot and Osso filed other motions, including a request for expert assistance and for independent DNA testing. (Supp. Clerk's Record at 111-132.) Based on those motions, the trial court authorized funds for an investigator, a forensic expert assistance, a psychologist, and a criminologist. The defense motion for DNA testing

was still under consideration when Villanueva's motion for Campa to substitute in as counsel was granted.

Campa filed a "Motion to Adopt All Motions of Prior Appointed Counsel," asking the trial court to consider "all motions previously filed by [the four prior attorneys] . . . as though said motions were filed by Phillip C. Campa personally." (Clerk's Record at 6.) The trial court granted that motion both orally and in writing. (Clerk's Record at 8; Tr. Vol. 4 at 4.) The respondent argues that "[t]his order leaves little doubt that trial counsel obtained a ruling which incorporated all prior pleadings made by previous counsel–there was nothing more for counsel to do." (Docket Entry No. 41 at 36-37). Villanueva argues that his reindictment clouded the record so that the trial court did not reconsider the substance of those motions. The record does not support this argument.

Initially, the trial court designated Villanueva's case as Cause Number 9424669. After reindictment, his case was tried under Cause Number 730975. When trial counsel filed his motion to reurge prior motions, he filed it under the new cause number. Someone penciled in the earlier cause number on that pleading. As a result, Villanueva argues, "those motions did not become part of the Court's file in Cause No. 730975, and were not before the Court in said cause, with the unexplained exception" of the motion to suppress. (Docket Entry No. 34 at 19-20). Villanueva claims that trial counsel waived the earlier motions, an error that was "prejudicial as it minimally deprived Villanueva of the assistance of a State-paid independent DNA expert, criminologist, private investigator, and psychiatrist or psychologist." (Docket Entry No. 34).[5]

---

[5]     The respondent argues that Villanueva failed to exhaust this claim in state court. The AEDPA requires that an inmate "exhausted the remedies available in the courts of the State[.]"   28 U.S.C. § 2254(b)(1)(A). The exhaustion doctrine, which seeks to preserve "a delicate balance and compromise of both state and federal concerns," *Carter v. Estelle*, 677 F.2d 427, 442 (5th Cir. 1982), requires a petitioner

(continued...)

Campa moved to reurge the earlier motions and the trial court granted his motions to reurge. Villanueva's complaint is not that trial counsel did not reurge the motions, but that his pretrial investigative efforts did not follow those of his predecessors. In his other grounds for relief, Villanueva faults Campa for not retaining a criminologist and private investigator (Claim Two), not conducting independent DNA testing (Claim Three), and not seeking psychological expert assistance (Claim Six). Those claims subsume the claim of trial counsel's alleged failure to reurge the prior attorneys' motions. For the reasons the court discusses at greater length with respect to the claims, neither they nor this first claim merits habeas corpus relief.

This court denies Villanueva's first ground for relief.

## B.    Failing to Investigate (Claim Two)

In his second claim, Villanueva challenges trial counsel's efforts to suppress the confession. Villanueva chiefly faults Campa for not interviewing the police officers who interviewed him. Villanueva also argues that Campa should have "procure[d] witnesses for testimony relevant to

---

[5](...continued)
to give the state courts a fair opportunity to correct problems of a constitutional dimension. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *Rose v. Lundy*, 455 U.S. 509, 518 (1982). The exhaustion doctrine focuses on whether an inmate has given the state courts an adequate opportunity to resolve the issues for which he seeks federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Villanueva's state habeas application did not list counsel's allegedly deficient attempt to reurge earlier motions as a separate ground for relief. Instead, in the "background" section of his brief, Villanueva tersely commented that "Campa failed to secure a hearing and rulings on twenty three motions filed by attorneys Allen Isbell and Gilbert Villarreal thereby abandoning all of them and in effect waiving the Defendants colorable arguments and interests and rights as promoted by the motions or prior counsel . . . This was another major error in his performance as an attorney." (State Habeas Record at 28.) Because Villanueva never asked the state habeas court to grant relief on that issue, the respondent contends that he did not exhaust the claim. Even though the parties debate the effect of the exhaustion doctrine on this issue, the AEDPA authorizes a court to deny non-meritorious unexhuasted claims. 28 U.S.C. § 2254(b)(2). The court examines and denies Villanueva's claim on the merits.

defensive issues in the guilt-innocence phase of trial," witnesses who would have helped the suppression arguments at trial. (Docket Entry No. 34 at 21).

As previously discussed, in the short time Campa had before the suppression hearing, he "immediately started to prepare." He interviewed Villanueva, met with the trial prosecutor, and examined the State's file. Campa "did not speak to any officers prior to the hearing or trial." (Trial Counsel Affidavit at 84-93.) Villanueva alleges that Campa provided ineffective assistance by not interviewing the officers involved in his arrest and his confession. Villanueva argues that Campa's deficient representation extended into the guilt/innocence phase of trial because he did not defend against the admission of his confession with help from an investigator and a criminologist.

Villanueva fails to identify what information Campa would have gleaned from interviewing the police officers before the hearing. Villanueva has not identified any evidence that Campa did not present because he failed to talk to the police officers or use an expert investigator or criminologist. Villanueva has not pointed to any other witnesses who could have provided additional information about his interactions with the police officers. Villanueva has not shown what additional investigation would have revealed that would have helped the defense in the suppression hearing or at trial.

The Supreme Court has repeatedly emphasized a trial attorney's duty to investigate viable defensive theories. *See Porter*, ___ U.S. at ___, 130 S.Ct. at 452-53); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Williams v. Taylor*, 529 U.S. 362, (2000); *Strickland*, 466 U.S. at 688. But merely showing a lapse in investigation is insufficient for federal habeas relief. "[A] petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356,

361 (5th Cir. 2005); *see also Greer v. Thaler*, 380 F. App'x 373, 386 (5th Cir. 2010); *Carty v. Quarterman*, 345 F. App'x 897, 903 (5th Cir. 2009); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006); *Duff-Smith. v. Collins*, 973 F.2d 1175, 1183 (5th Cir. 1992); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

Villanueva invokes the presumptive-prejudice test from *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984). "*Cronic* held that a Sixth Amendment violation may be found without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial when circumstances exist that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Wright v. Van Patten*, 552 U.S. 120, 124 (2008) (quotation omitted). Villanueva asserts that Campa's "woefully deficient investigation is presumed prejudicial," alleviating the need to substantiate his claim that trial counsel could have turned up important information through additional interviews and investigation. (Docket Entry No. 34 at 27).

*Cronic*'s presumption of prejudice does not apply. *Cronic* applies "in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000); *see also Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002). This is not a case in which "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. Campa did not abandon Villanueva. Villanueva fails to acknowledge the clear record evidence that Campa did prepare for the suppression hearing and fails to acknowledge that his own choice to retain counsel on the eve of trial limited counsel's ability to make more extensive preparations. Even within the time limits created by Villanueva's choices, trial counsel's efforts to prepare remove this claim from *Cronic*'s presumption of prejudice.

Villanueva makes broad allegations about how interviewing police officers or retaining an investigator or criminologist would have changed the outcome of his trial. Villanueva argues that adequate pretrial investigation would have allowed Campa to challenge evidence as improperly authenticated, properly to cross-examine witnesses, avoid asking questions that resulted in hearsay, and provide testimony from additional witnesses. (Docket Entry No. 34 at 27-28). But Villanueva's arguments are both vague and speculative. "In the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial," federal habeas relief cannot issue. *Barndard v. Collins*, 958 F.2d 634, 643 n.11 (5th Cir. 1992); *see also Ayestas v. Thaler*, ___ F.3d ___, 2012 WL 573436 (5th Cir. Feb. 22, 2012). When a petitioner does not identify *what* a deeper investigation would have revealed, a court can only speculate on the evidence trial counsel did not develop and how it would have impacted the trial. *See Whitaker v. Quarterman*, 200 F. App'x 351, 355 (5th Cir. 2006); *Duff-Smith*, 973 F.2d at 1183. Such speculation is an insufficient basis for habeas relief.

Villanueva's generalized arguments do not demonstrate what leads, evidence, or defensive theories would have resulted from additional investigation or expert assistance. He provides no evidence or affidavits – apart from a new affidavit giving his version of the circumstances surrounding the confession, the substance of which was fully available to trial counsel – to substantiate his claim that had trial counsel investigated more, the outcome would have been different. The state habeas court reasonably found that Villanueva "fail[ed] to demonstrate how he was harmed" when trial counsel did not interview either "the police officers" or the "other witnesses alleged [in his] habeas petition." (State Habeas Record at 226, 248.) With only speculation on what would have resulted from additional investigation, Villanueva's second claim lacks merit. The state

habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### C.    Failing to Obtain Forensic Evidence (Claim Three)

Villanueva claims that Campa should have sought the assistance of a DNA expert. When the police took Villanueva into custody, he voluntarily gave them samples of his pubic hair. The police submitted Villanueva's pubic hairs and three hairs found at the scene to the crime lab. Reidun Hilleman, a chemist with the Houston Police Department Crime Lab, microscopically compared Villanueva's and the victim's pubic hair with the three hairs found at the scene. One hair was microscopically dissimilar to those from both the victim and Villanueva. (Tr. Vol. 17 at 618.) Two were consistent with Villanueva's pubic hair. Hilleman testified at trial, linking Villanueva to the crime, but not conclusively. Hilleman explained that "[h]air comparison is not the same thing as fingerprints. It does not identify a person to the exclusion of all others." (Tr. Vol. 17 at 621.) Instead, a forensic expert looks for "hair characteristics" that "fall within [a] range." (Tr. Vol. 17 at 621.) Campa's cross-examination of Hilleman highlighted the fact that her analysis could only "categorize a particular hair as coming from a particular racial group[.]" (Tr. Vol. 18 at 638.) Hilleman testified that "[i]t's possible that there might be someone else in the general population who would exhibit some of those characteristics" as the recovered hairs. (Tr. Vol. 18 at 652.) When Campa asked Hilleman when a forensic expert would classify two hairs as a "match," she responded that you would look to see if "all of the internal characteristics are the same[.]" (Tr. Vol. 17 at 615-16.)

Hilleman had submitted the hairs to the Houston Police Department Crime Lab for DNA testing. Joseph Chu, head of the DNA Serology section of the Houston Police Department Crime

Lab, testified at trial that Villanueva's hairs corresponded to two of the hairs found at the scene. (Tr. Vol. 18 at 678-79.) Chu testified that the characteristics of the pubic hairs at the scene "would occur in one out of twenty-nine people of Hispanic population." (Tr. Vol. 18 at 680.)

Campa's closing argument was that the jury should not consider the DNA hair testing as conclusive evidence of Villanueva's guilt. His cross-examination of both experts emphasized that the test results at most placed Villanueva within a probable group, a group that included a large population. Campa urged the jury to consider that at most, the DNA testing showed "a positive match [of] a class of people. One out of twenty-nine Hispanics have these unique characteristics." (Tr. Vol. 21 at 1282.) Campa argued that "[i]t didn't match [Villanueva]. It matched the classification of [Villanueva]." (Tr. Vol. 21 at 1284.) Campa's closing argument also emphasized that the police found pubic hair at the scene that did not "match" the victim or Villanueva. (Tr. Vol. 21 at 1282 85.) Hilleman testified that it is not "really unusual" to find pubic hair in a house that does not match any known person. (Tr. Vol. 17 at 619.) Campa elicited testimony that a secondary transfer could have placed Villanueva's pubic hair in the victim's home. His argument dealt with a concern not addressed by Villanueva – how to deal with the fact that, even though the forensic testing correlated to a somewhat-large population, Villanueva fell within that group.

In response, the State conceded during closing argument that "[o]ne out of twenty-nine may not be enough for you" to "convict him of capital murder." The State argued that when the jury "start[s] piecing all [of the evidence] together, it should be perfectly clear . . . what has occurred here." (Tr. Vol. 21 at 1298.) In other words, the hair was a contributory, but not determinative, part of the State's case against Villanueva.

Villanueva's state habeas application faulted Campa for not challenging the forensic evidence. Villanueva submitted an affidavit from Dr. Elizabeth Johnson, a forensic scientist, who reviewed the laboratory reports and the trial testimony. Dr. Johnson concluded that "the work performed by the HPD laboratory cannot and does not identify [Villanueva] as the donor of hair[.]" (State Habeas Record at 139.) Dr. Johnson explained that because the crime lab tested only one genetic region, the testing did not narrow the source of the hairs any further than "4.9% of the Caucasian population, 5.3% of the Black population, and 3.4% of the Hispanic population." (State Habeas Record at 137.) Dr. Johnson expressed concern with the use by the State and Campa of the term "match" to describe the crime lab's findings. She explained:

> The term "match" is extremely misleading and may easily be mis-interpreted by lay jurors as meaning "identity" without considering the number of other people who have the same genetic markers and who could be the source of the evidence. The term match has long been abandoned by many laboratories in favor of the more accurate and less biased phrase "consistent with" or "the [defendant] cannot be excluded as the source of the evidence."

(State Habeas Record at 137.)

Dr. Johnson concluded that the State's presentation of DNA evidence misled the jury. "By reporting the evidence as a match to [Villanueva] and giving [Villanueva's] frequency within his own ethnic group and no other statistics Mr. Chu is potentially mis-leading the jurors to believe that the killer had to be Hispanic and that [Villanueva] was probably the killer." (State Habeas Record at 138.)

Dr. Johnson also criticized the procedure the crime lab used in testing the hairs. Dr. Johnson encouraged renewed DNA testing using techniques that "could exclude [Villanueva] as the source of the hairs." (State Habeas Record at 138.) Dr. Johnson concluded:

> Based upon my review of the laboratory documents and trial testimony provided me it is my opinion that the work performed by the HPD laboratory cannot and does not identify [Villanueva] as the donor of hair 2 and hair 5 collected from the decedent's residence. Joseph Chu's statement that the hairs match the DNA type of [Villanueva] does not establish the identity of the hair donor. In fact approximately 1 in 20 individuals could be the source of these hairs. Additional testing on DNA extracts presumably still in the possession of the HPD laboratory may be performed which could exclude [Villanueva] as the source of the hairs.

(State Habeas Record at 139.) Based on those conclusions, Villanueva argued that Campa should have presented testimony from an expert, such as Dr. Johnson, to refute the State's forensic evidence.

The state habeas court found that Dr. Johnson's "conclusions regarding DNA evidence presented during [Villanueva's] trial neither diminishes nor casts doubt on the results of the DNA analysis performed by the Houston Police Department crime lab or the DNA evidence presented during [his] trial." (State Habeas Record at 249.) The state habeas court found no basis for accepting Dr. Johnson's request for additional testing:

> Further the Court finds based on a review of Johnson's affidavit and report that Johnson's statement that additional testing could be performed which [c]ould exclude [Villanueva] as the source of the hairs is speculative and not supported by evidence elicited at trial by evidence presented by Johnson or by evidence proffered in [Villanueva's] habeas petition.

(State Habeas Record at 249.)[6]  Finally, the state habeas court found that Campa had "conducted

independent research on DNA and . . . did not hire any experts because [Villanueva] had informed

defense counsel that his family could not afford experts."  (State Habeas Record at 228.)

Villanueva reasserts his claim that Campa should have sought expert assistance with regard

to the DNA evidence.  Because the prior appointed attorneys had received permission from the trial

court to hire an expert, Villanueva argues that Campa's "decision to forgo hiring a DNA expert was

based on financial considerations, not trial strategy."  (Docket Entry No. 34 at 36).  Villanueva

contends that the failure to seek such help prejudiced him because Campa could have used testimony

similar to that coming from Dr. Johnson to capitalize on the defense theory that another man raped

and killed the victim.  Villanueva argues that there was a reasonable probability of a different result

had a "DNA expert . . . assisted counsel in preparing a proper cross-examination of the State's expert

and clarified that the State's DNA test results did not, in fact, provide a definitive identification of

Villanueva as the perpetrator but merely included him in a relatively large pool individuals

(including Lazaro Aguilar) who could also have committed the offense."  (Docket Entry No. 34 at

38).

Villanueva has not shown that the state habeas court's rejection of this claim was

unreasonable.  Little DNA material remained when the State concluded its testing.  The small

amount of genetic material has prevented retesting, even with the scientific advances since trial and

even with delays to take full advantage of any advances.  Villanueva has not shown what additional

---

[6]      The state habeas court incorrectly restated Dr. Johnson's statement as that additional testimony
would, not could, exculpate Villanueva.  But even recognizing this error, Villanueva has not shown what the
results of additional testing would *or* could be.  Moreover, as discussed in the text that follows above, trial
counsel adequately cross-examined witnesses on the forensic evidence.

helpful testing could have been done years ago, Villanueva can only speculate that additional progress in the DNA field might allow future testing, someday.

Campa did not leave the State's forensic evidence unchallenged. The existing evidence showed the absence of a forensic link between the hair and Villanueva individually as opposed to a large population group that included him. Campa argued that the jury had a basis to attribute the pubic hairs to someone in that same group other than his client. The Supreme Court has recognized that "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *See Richter*, ___ U.S. at ___, 131 S.Ct. at 791. Campa's cross-examination of the State's experts and closing argument placed the same themes before the jury that Villanueva argues an expert witness would have. Campa identified the same defect in the evidence as Dr. Johnson – that the State's evidence did not conclusively link Villanueva to the hair found at the scene. Campa argued to the jury that the testing did not "match" Villanueva, but rather correlated to a large category of people. Dr. Johnson's affidavit provides no additional basis for the argument. The state habeas court reasonably found that trial counsel's performance in challenging the forensic evidence did not fall below constitutional requirements.

Nor has Villanueva shown *Strickland* prejudice. The State mentioned the pubic hair evidence but did not argue that the jury should make it a determinative basis for conviction. Instead, the State encouraged the jury to treat it as one piece of evidence among many others. Removing that forensic evidence from the jury's consideration does not measurably undermine the strength of the case against Villanueva. As the State argued, Villanueva had confessed to the rape and murder. He had made incriminating statements to others. He stole a radio from the victim's home. The forensic evidence supported the State's case but was hardly the lynchpin for Villanueva's conviction. The

state habeas court found no reasonable probability of a different result had Campa used expert testimony to punctuate more aggressively the limits on the forensic evidence Campa had already identified and argued before the jury.

Villanueva has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). This court denies this claim.

## D.    Improperly Conducting Jury Selection (Claim Four)

Villanueva claims that Campa was deficient in questioning the venire members. Villanueva identified "some 23 issues or matters of disqualifying bias" in which trial counsel "failed to question the venire panel consistently, if at all." (Docket Entry No. 34 at 38) (quotation omitted). Villanueva alleges that Campa could not make an intelligent assessment of venire members because his questioning:

> consisted primarily of leading questions that crime scene photographs would not stir the jury's emotions, that trial objections would not make the juror think the defendant was trying to hide something, and that the jury had a general understanding of the defendant's presumption of innocence and the State's burden of proof.

(Docket Entry No. 34 at 41). Villanueva claims that Campa's inadequate questioning handicapped his ability to discover views that did not favor the defense. Villanueva points out that Campa only challenged three prospective jurors for cause and exercised fewer than half of the available peremptory strikes.

Villanueva inadequately briefed this claim in state court. In his amended state habeas application, Villanueva listed the areas in which Campa allegedly should have focused his questioning. But Villanueva did not link any unasked question to any purportedly biased juror. Villanueva did not demonstrate to the state courts how questioning on those particular areas would

have affected any potential juror's ability to serve.  The state habeas court found that he "provide[d] no specific examples of how or with which prospective jurors . . . defense counsel allegedly conducted an inadequate voir dire."  (State Habeas Record at 230.)  With that omission, the state habeas court concluded that Villanueva "fails to establish that he was denied the effective assistance of counsel during voir dire."  (State Habeas Record at 249.)

The state habeas court's denial of Villanueva's state habeas claim was not an unreasonable application of federal law.  An inmate alleging error during jury selection must show actual prejudice, primarily by identifying "any particular juror [who] was in fact prejudiced" because of the inept questioning.  *Neville v. Dretke*, 423 F.3d 474, 483 (5th Cir. 2005); *see also Teague v. Scott*, 60 F.3d 1167, 1172-73 (5th Cir. 1995) (holding that an inmate must make specific factual allegations showing that a biased venire member actually served on the jury); *Clark v. Collins*, 19 F.3d 959, 965 & n. 25 (5th Cir. 1994) (requiring an inmate to prove that counsel's performance in voir dire led to seating of biased jury).  The inmate must also demonstrate that more questioning would have "affect[ed] the verdict."  *Neville*, 423 F.3d at 483.  The state habeas court's dismissal because Villanueva failed to link his claim of deficient performance to particular jurors was not unreasonable.

On federal review, Villanueva concedes that he "inartfully" put this claim before the state courts.  (Docket Entry No. 34 at 41).  Villanueva attempts to cure the defect in his state-court arguments by reviewing the questioning of each juror and pointing to areas needing additional questioning.  (Docket Entry No. 41 at 42-48).  The Supreme Court, however, has recently "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did."  *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1399.  Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied

34

federal law to facts not before the state court," the court in *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at ___, 131 S. Ct. at 1399, 1400. Villanueva's augmentation of the state court argument does not provide a basis for federal relief.[7]

Even considering new arguments, however, Villanueva has not shown that he merits habeas relief. "Voir dire plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (quotation omitted). Villanueva's complaint is not that Campa's deficient questioning allowed a biased juror to serve. Instead, Villanueva argues that "competent legal counsel would have made the effort to delve deeper" in questioning prospective jurors. (Docket Entry 34 at 43, 44, 45, 46). Villanueva has still not shown that the jury or any juror was biased against him. His allegations of *Strickland* prejudice are conjectural. Villanueva can only speculate that, had trial counsel inquired more diligently, he would have uncovered bias.

A review of the voir dire record does not support Villanueva's argument that venire members expressed concerns that made additional inquiry necessary. In some cases, Villanueva highlights isolated statements without reviewing the entire questioning. For instance, Villanueva argues that one venire member, whose husband was a police officer, "TWICE professed to starting with a

---

[7]     The respondent argues that Villanueva's expansion of this claim makes it unexhausted. As Villanueva raises his claim "in a significantly different legal posture" than his state-law complaint, he has not fully exhausted his federal claim. *See Anderson v. Johnson*, 338 F.3d 382, 387 (5th Cir. 2003) (internal quotation marks and citation omitted). Even if Villanueva's state-court briefing fully exhausted the arguments he makes in this proceeding, he has not show that trial counsel's handling of voir dire violated his constitutional rights. This claim is analyzed and denied on the merits.

presumption of guilty based solely on the indictment in the current case *and* to having previously

formed opinions in other capital cases based solely upon news reports[.]" (Docket Entry No. 34 at

43). Campa questioned this individual. In response to Campa's questioning, the venire member

initially said that she thought "he's guilty right now," based on the charges. (Tr. Vol. 6 at 145-46.)

Additional questioning, however, revealed that she "believe[d] that everyone deserves a fair trial"

and would "have to hear [all the evidence] first" before reaching a decision. (Tr. Vol. 6 at 146-47.)

She explained that her husband's employment as a police officer would not influence her. Instead,

she "see[s] everyone being just the same[.]" (Tr. Vol. 6 at 142.) She explained that she understood

the State's burden to prove Villanueva guilty beyond a reasonable doubt and that he was innocent

until proven otherwise. (Tr. Vol. 147-48.)

Similarly, Villanueva points to one venire member who expressed some concern about being

away from her work during trial. Villanueva does not mention, however, that Campa's questioning

on that subject produced assurances that she would focus on the trial, giving it "if not 100 [percent

of her attention] pretty close to it." (Tr. Vol. 11 at 69.) Campa's questioning addressed the precise

concerns that Villanueva faults him for not uncovering.

Villanueva also exaggerates the potential for the jury panel to be biased against him. For

instance, Villanueva claims that one venire member's "views towards law enforcement would affect

his ability to serve on the jury," (Docket Entry No. 34 at 45-46), because that individual stated that

"I think that the high majority of [officers] are outstanding citizens, that they do their job and they

do it within the limits of the law." (Tr. Vol. 9 at 25-26.) This statement, however, came out in the

context of questioning about a time that a police officer had unreasonably detained the individual.

As the respondent observes, "the prosecutor was questioning . . . to see if he had a bias *against the*

*State*, not against Villanueva." (Docket Entry No. 41 at 63). A full review of this individual's colloquy with the attorneys revealed no favoritism toward the State or police officers.[8]

Villanueva also makes speculative assertions, such as that some venire members held "pro-death penalty stance[s]," without identifying bias. (Docket Entry 34 at 44). Villanueva claims that a venire member being "conservative on crime issues" required additional probing questions. No error is revealed from a full review of each juror who Villanueva claims Campa should have questioned more thoroughly. Villanueva has not shown that additional questioning would have exposed juror bias.

Campa's approach to jury selection falls within the area that is given deference. Villanueva has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## E.    Evidentiary Errors (Claim Five)

Villanueva alleges that Campa "was inept and ineffective at direct examination and cross-examination and committed numerous evidentiary errors that had a direct and devastating impact on the trial[.]" (Docket Entry No. 34 st 51). Villanueva identifies five categories in which Campa allegedly failed to make adequate objections: (1) hearsay testimony from the State's witnesses; (2) leading questions the State posed to its witnesses; (3) narrative answers given by the State's witnesses; (4) improperly or inadequately admitted physical evidence; and (5) speculative and conclusory testimony. Villanueva asserts that, even if each trial error individually did not amount to *Strickland* prejudice, the cumulative effect of the errors did.

---

[8]    Similarly, Villanueva cites an interchange in which one juror described a negative interaction with law enforcement. While Villanueva asserts that this somehow created a bias against the defense, a full review of the colloquy provides no basis to question this juror's ability to serve.

Campa explained in his affidavit that he limited his objections before the jury, as a matter of strategy. Based on "the credible assertions in the affidavit of defense counsel Philip Campa and a review of the trial record," the state habeas court found that "defense counsel lodged objections when appropriate[.]" The state habeas court endorsed Campa's explanation in his affidavit that based on experience, "if a lawyer is to maintain good rapport with a jury the lawyer needs to carefully select when and how to make his objections." Campa added that "this is especially true of defense counsel because there is a tendency for jurors to believe that defense attorneys are always trying to get the guilty off on technicalities." Campa felt that "objections should be carefully weighed against what impact they might have on jurors." (State Habeas Record at 131-32.) He elaborated that because "each time an attorney objects or interrupts a witness jurors feel that the defense is trying to hide something or that what was said was somehow damaging to the accused . . . an objection can sometimes call more attention and result in more harm than good." Campa explained his strategy: "it is defense counsel's position that only objections that are truly necessary should be made unless required to preserve error for appeal"; and "if the evidence is going to be admitted that it does little good to object other than to simply interrupt the State." (State Habeas Record at 131-32.) Villanueva contends that trial counsel's justification is only an attempt to cover his inaptness.

Each category of the allegedly deficient approach to objections is examined below.

### 1.    Failing to Object to Hearsay

Villanueva's petition contains an index listing instances when trial counsel allegedly should have made a hearsay objection. The state habeas court grouped the allegations as follows:

(1)     testimony by four witnesses about Villanueva's possession of a stereo owned by the victim;

(2)     testimony from three witnesses that Villanueva previously had problems with the victim;

(3)     a police officer's testimony that Villanueva's wife denied that she had scratched him;

(4)     a police officer's testimony about a wallet found inside the victim's house and about a missing padlock from the victim's home;

(5)     one witness's testimony that neighbors had asked Villanueva to leave a party on the night of the murder because he was drunk and disruptive;

(6)     a police officer's explanation that witnesses said that Villanueva took a bus across town the morning after the murder;

(7)     testimony about what the mother of the owner of the wallet found at the victim's home told a police officer; and

(8)     testimony that a paramedic told a police officer that the victim's door was unlocked and opened when they arrived on the scene.

The state habeas court reviewed each category and found that trial counsel's performance was not deficient. That court had found that other properly admitted testimony, including Villanueva's own statement to police, corroborated the testimony. The state habeas court found no *Strickland* error when the same information that Villanueva labels improperly-objected-to hearsay was presented to the jury in another admissible form. The state habeas court also found that some of the testimony Villanueva identified was not hearsay at all and that some of the testimony was hearsay but advanced the defense theory of the case by casting suspicion on others as the murderer. (State Habeas Record at 232-238.)

The state habeas court comprehensively reviewed the record and reasonably found no constitutional error in trial counsel's failure to make hearsay objections. This court's review of the

record shows that it supports the state habeas court's holding. A few examples are both representative and illustrative. Villanueva faults Campa for not objecting when a police officer testified that witnesses told him about Villanueva taking a bus across town some time after the murder. (Tr. Vol. 15 at 206-07.) Substantial other evidence placed the same information before the jury. Properly admitted information, including Villanueva's own police statement and testimony from a witness who saw him getting off a bus, verified the hearsay statement. Villanueva himself testified that he "went and caught a bus" and "brought that radio" to his friend (though he claimed to have purchased, not stolen, the radio). (Tr. Vol. 29 at 963.) Even if trial counsel had objected to the police officer's testimony, the same information came before the jury later at trial. No *Strickland* deficiency is present when the alleged improper evidence that was not objected to is cumulative of other admissible trial testimony. *See Woodfox v. Cain*, 609 F.3d 774, 817 (5th Cir. 2010); *United States v. Allie*, 978 F.2d 1401, 1408-09 (5th Cir. 1992).

Two other examples show the inconsequential effect of the unobjected-to hearsay. Villanueva complains that Campa should have objected when a police officer detailed his conversations with Randall Bates, the man whose wallet the police found in the victim's house. (Tr. Vol. 15 at 87-89.) Bates testified at trial about the same conversation, describing in greater detail how he had lost his wallet five years earlier while visiting Houston. (Tr. Vol. 16 at 217-21.) Villanueva also complains that Campa should have objected when two police officers each testified that, when they asked Villanueva's wife how he got the scratches visible on his chest, she denied fighting with him, as he had told the police. (Tr. Vol. 15 at 921 Vol. 16 at 413.) During Villanueva's own testimony, however, he disclaimed his previous statement. (Tr. Vol. 19 at 987-88, 1005.) The wife testified that Villanueva had received the scratches from a cat and while doing yard work. (Tr.

Vol. 20 at 1169-71.) These examples demonstrate that, even if trial counsel could have made a valid hearsay objection and the testimony had been excluded, it would have made no difference at trial.

The record bears out the other justifications the state habeas court gave for finding no *Strickland* error in not making hearsay objections. The state habeas court reasonably found neither deficient performance nor prejudice.

        2.     *Leading Questions and Narrative Answers*

Villanueva also complains that Campa failed to object to the prosecutor's repeated use of leading questions. Villanueva equates the leading questions with prosecutorial misconduct and asserts that those inquiries "lead witnesses to devastating results." (Docket Entry No. 34 at 57). Deciding whether to "object to leading questions and the like is generally a matter of trial strategy as to which [federal courts] will not second guess counsel." *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993). Campa adopted a strategy of limiting his objections to maintain a positive rapport with the jury. The state habeas court found that "defense counsel lodged objections when appropriate and in accordance with his trial strategy." (State Habeas Record at 238.) Campa's choice to limit interruptions in the flow of questioning is among the presumptively valid decisions that a court cannot second-guess.

Moreover, the Fifth Circuit has refused to find *Strickland* error relating to the prosecutor's leading questions when a petitioner fails to "explain how those instances likely would have resulted in a different trial outcome," especially if it "appears that the leading questions could have been simply rephrased." *Burnett*, 982 F.2d at 930. The state habeas court found that Villanueva failed "to demonstrate that . . . the State could not have rephrased its questions and elicited the desired information." (State Habeas Record at 239.) The state habeas court found that Villanueva did not

show that, "had defense counsel objected to witnesses answers on such basis, that the State could not have questioned the witnesses in a manner whereby the narrative answers would be eliminated and the desired testimony elicited." (State Habeas Record at 239.) Proper objections would have merely forced the prosecution to elicit the same information through repeated questions and answers.

The objections Villanueva argues should have been made may have changed the way in which information came before the jury. But Villanueva has not shown that such objections would have prevented the information from coming before the jury. To the contrary, the objections would have resulted in the information being repeated. Villanueva has not shown that making the objections altered the outcome. Villanueva has not met either of the *Strickland* requirements.

### 3. Chain of Custody and Authentication

Villanueva summarily contends that the State did not adequately establish a proper chain of custody for the introduction of State's Exhibits 56 and 85 through 89. Villanueva claims that Campa should have objected on that basis. Villanueva, however, has not described the gaps in the evidence of chain of custody. The state habeas court found that Villanueva "fail[ed] to allege how the authentication of *States Exhibits 56* and *85* through *89* was improper or how the State failed to lay a proper chain of custody with respect to *States Exhibits 85 through 88*," and failed to "demonstrate that the exhibits could not have been properly authenticated or the proper chain of custody established." (State Habeas Record at 240.)

Under Texas law, gaps in the chain of custody affect the weight, not admissibility, of evidence. *See Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007); *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997). Villanueva has not described how trial counsel could have kept the jury from considering the challenged exhibits or changed the manner in which the jury

would do so. The state habeas court was not unreasonable in concluding that Villanueva had not shown deficient performance or prejudice in Campa's failure to challenge the chain of custody for these exhibits.

### 4. Speculative and Conclusory Testimony

Villanueva also argues that witnesses made conclusory or speculative statements without objection. In each instance Villanueva cited, the state habeas court found that the testimony was admissible, that other trial evidence corroborated the testimony, or that Campa's strategic approach justified refraining from objecting. Consistent with the finding that trial counsel "lodged objections when appropriate and in accordance with his trial strategy," (State Habeas Record at 242), the state habeas court found that Villanueva had not shown deficient performance or prejudice. Villanueva has not shown that the state habeas court reached an unreasonable result. Villanueva has not shown that any objection would have measurably changed the information before the jury. And given the strong evidence of guilt, the instances in which Villanueva contends that trial counsel should have objected to conclusory or speculative statements would not have affected the outcome. Villanueva has not shown that the state court was unreasonable in finding that trial counsel's representation did not amount to *Strickland* error.

### 5. The Cumulative Effect of Failing to Object

Campa repeatedly objected to testimony and other evidence. Despite this record, Villanueva argues that, even if each instance in which Campa failed to object made no difference, taken together, the cumulative effect could have changed the outcome. The state habeas court reviewed each alleged lapse in Campa's performance and found no error and no prejudice. This court concludes that, even had trial counsel made each of the objections Villanueva argues he should have

made, there is no constitutionally deficient performance and no reasonable probability of a different result. The objections would not have lessened the impact of Villanueva's confessions, removed his incriminating statements from the jury's consideration, changed the fact that he stole property from the victim's home, or removed the forensic evidence. The errors Villanueva attributes to trial counsel would not have measurably changed the case. This court finds no error, individually or cumulatively, in trial counsel's strategy in making objections.

### F.     The Failure to Present Mitigating Evidence (Claim Six)

The defense rested in the punishment phase of trial without calling any witnesses. Although the Constitution does not "require defense counsel to present mitigating evidence . . . in every case," *Wiggins*, 539 U.S. at 533-34, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal*, 286 F.3d at 236-37 (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)). Villanueva claims that Campa's failure to present mitigating evidence violated his constitutional rights.

In the state habeas court, Campa explained that the omission of mitigating evidence was not an oversight. Campa stated as follows in his affidavit:

> Once the jury returned with a guilty verdict, which took several hours, the Court afforded each side some time to prepare for the punishment phase of trial. During that time, I discussed with [Villanueva] how we should proceed. He vehemently maintained his innocen[c]e. He did, however, not permit me to call any witnesses on his behalf. I also felt that given his position, it did not make sense for him to testify.

(Trial Counsel Affidavit at 9.) In an on-the-record colloquy, Villanueva explained that the absence of mitigating witnesses was his choice:

| | |
|---|---|
| Campa: | Mr. Villanueva, is it your decision not to have any of your family testify at the punishment phase of this case? |
| Villanueva: | That's correct. |
| Campa: | Did you give me the instruction not to call any of your family members to the stand? |
| Villanueva: | That's true. |
| Campa: | Did you also give me the instruction not to call any other witnesses to the stand at the punishment phase? |
| Villanueva: | That's true. |
| Campa: | Did you also decide not to take the stand during the punishment phase of your case? |
| Villanueva: | That's true. |

(Tr. Vol. 22 at 60–61.)

"Obviously, a competent defendant may, as master of his or her own defense, elect to forgo the presentation of mitigating evidence." *Moore*, 194 F.3d at 616 n.8. "Under Fifth Circuit case law, 'when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel.'" *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (quoting *Roberts*, 356 F.3d at 638); *see also Ayestas*, ___ F. App'x at ___, 2012 WL 573436 at *5-6. "Cutting through the smoke, it is apparent that [this court is] being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).

Villanueva has not shown a basis to question his waiver of the right to present mitigating evidence. His "directions were entitled to be followed." *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987); *see Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004), *Autry v. McKaskle*, 727 F.2d 358, 362 (5th Cir. 1984). As the state habeas court observed, "when a defendant preempts an attorney's strategy by insisting that certain evidence be presented or kept out, no claim of ineffectiveness can be sustained." (State Habeas Record at 247.)

In addition, Villanueva has not shown what mitigating information should have been presented. Villanueva cannot simply allege that trial counsel erred by not investigating more or by failing to call more witnesses; Villanueva "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Green*, 882 F.2d at 1003; *see also Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). At a minimum, he " must name the [proposed] witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory*, 601 F.3d at 352 (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008); *O'Brien v. Dretke*, 156 F. App'x 724, 733 (5th Cir. 2005). Constitutional error cannot rest on the naked assertion that trial counsel should have done more, for "speculations as to what [uncalled] witnesses would have testified is too uncertain." *Alexander*, 775 F.2d at 602; *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative.").

Villanueva makes broad claims about what Campa should have done. But Villanueva has not, on either state or federal habeas review, identified specific evidence that he faults Campa for not presenting.[9] As the state habeas court stated:

> The Court finds based on a review of [Villanueva's] habeas petition that [he] fails to demonstrate that defense counsel did not investigate potential punishment evidence or that punishment witnesses were available and that their testimony would have benefitted the defense.
>
> Further the Court finds based on a review of [his] habeas petition that [Villanueva] offers no evidence that he suffered from a psychological deficit or disorder emotional abuse physical violence or sexual abuse or that there were witnesses available to testify to such evidence.

(State Habeas Record at 246-47.) The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## IV. Conclusion

This court has reviewed each of Villanueva's points of error and finds that he has not shown *Strickland* error. "[T]here can be no such thing as an error-free, perfect trial." *United States v. Hasting*, 461 U.S. 499, 508 (1983). Villanueva has not shown that a reasonable attorney acting differently would have achieved a different result. Villanueva repeatedly faults trial counsel for neglecting to perform certain tasks, such as not hiring experts or not presenting mitigating evidence. But Villanueva has not shown how proceeding differently would have changed the trial outcome. Habeas relief cannot be based on such speculative assertions.

The evidence against Villanueva was overwhelming. In his confession, Villanueva described to the police a cruel, and violent sexual attack on his elderly neighbor. Villanueva has not shown

---

[9] While Villanueva has provided affidavits from family members describing their interaction with trial counsel, the affidavits do not mention mitigating evidence.

that the police violated his constitutional rights during his interrogation. The Fifth Circuit has routinely found that the "horrific facts of the crime," *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007), the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against finding *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *Ladd*, 311 F.3d at 360; *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989).

Other evidence linked Villanueva to the rape and murder. The record is bereft of facts that would mitigate against a death verdict. Taken individually and cumulatively, Villanueva has not shown that trial counsel's representation was deficient in ways that prejudiced him. This court denies federal habeas relief.

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). The court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. AEDPA only allows a district court to issue a certificate of appealability ("COA") when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because settled precedent forecloses relief on Villanueva's claims, and he has not shown under the appropriate standard that any issue deserves appellate review, this court will not certify any of his habeas claims for consideration by the Fifth Circuit.

For the reasons described above, the court finds that Villanueva has not shown an entitlement to federal habeas relief. This court grants the respondent's motion for summary judgment, denies Villanueva's petition, and dismisses all of Villanueva's claims with prejudice. This court will not issue a certificate of appealability.

SIGNED on April 16, 2012, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge